**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **LOU MONTGOMERY,** *et al.* | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| **v.** | * | **Civil Case No. SAG-14-1520** |
| | * | |
| **CSX TRANSPORTATION,** *et al.* | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM AND ORDER

Following a workplace injury at the CSX Cumberland Yard ("the Cumberland Yard"),

Plaintiff Lou Montgomery sued Defendant CSX Transportation, Inc. ("CSX") under the Federal

Employers' Liability Act ("FELA"), and also sued Defendant Jamco Products, Inc. ("Jamco"),

alleging theories of negligence, strict products liability, and breach of warranty. In addition, Mr.

Montgomery's wife, Melissa Montgomery, brought a claim against Jamco for loss of

consortium. *See* [ECF No. 60]. Now pending are the following: (1) CSX's motion to strike the

report and to preclude the testimony of Mr. Montgomery's liability expert witness, Craig D.

Clauser, P.E.; (2) CSX's motion to strike the report and to preclude the testimony of Jamco's

liability expert witness, Dr. Dhyana Ranjan Pattanayak; and (3) CSX's motion *in limine* to

exclude, in part, the testimony of Mr. Montgomery's vocational rehabilitation expert witness,

Mark A. Lieberman, M.A., C.R.C. *See* [ECF Nos. 96, 97, 98].

The Court has reviewed CSX's motions, Plaintiffs' and Jamco's oppositions, and CSX's

replies. [ECF Nos. 103, 104, 105, 106, 107, 108, 109, 113, 115]. The Court has also reviewed

Jamco's "Reply to Defendant CSX Transportation Inc.'s Reply in Further Support of its Motion

1

to Strike Report and Preclude Testimony of Defendant Jamco Products, Inc.'s Liability Expert Witness, Dhyana Pattanayak, Ph.D." [ECF No. 116].   No hearing is necessary.   *See* Loc. R. 105.6 (D. Md. 2016).   For the reasons set forth herein, (1) CSX's motion to strike the report and preclude the testimony of Mr. Clauser will be DENIED; (2) CSX's motion to strike the report and preclude the testimony of Dr. Pattanayak will be GRANTED only as to Dr. Pattanayak's testimony regarding the opinions of CSX's liability expert, Dr. Zupan, and DENIED AS MOOT as to all other testimony; and (3) CSX's motion to exclude Mr. Lieberman's testimony regarding the availability of teaching jobs in western Maryland will be GRANTED.

## I.      BACKGROUND

On or about October 5, 2013, Plaintiff Lou Montgomery was employed by CSX and was working at the Cumberland Yard in or near Cumberland, Maryland.   Fourth Am. Compl. at ¶¶ 34, 35, [ECF No. 60].   At about 1:40 p.m., Mr. Montgomery went to place the toolbox he was holding onto a tool cart, which was designed and manufactured by Jamco.   *Id.* at ¶¶ 11, 12, 36, 43, 44.   As Mr. Montgomery placed the toolbox on the tool cart, the cart collapsed to the ground, causing the toolbox to fall, and causing Mr. Montgomery's body to lurch downward in order to continue to hold the toolbox.   *Id.* at ¶¶ 39, 40.   As a result, Mr. Montgomery experienced immediate pain, and sustained injuries to his back and lower extremities.   *Id.* at ¶¶ 41, 42.   The instant litigation followed.

On June 23, 2015, Plaintiffs served an expert disclosure in which they identified Craig D. Clauser, P.E., as their liability expert, and provided a copy of Mr. Clauser's report dated June 22, 2015.   *See* Mot. to Strike Clauser Report and Preclude Testimony Ex. A, [ECF No. 96-3]. Thereafter, on October 20, 2015, Plaintiffs served Mr. Clauser's supplemental report dated October 19, 2015.   Mot. to Strike Clauser Report and Preclude Testimony Ex. D, [ECF No. 96-

6].  Mr. Clauser was deposed on March 30, 2016.  *See* Mot. to Strike Clauser Report and Preclude Testimony Ex. E, [96-7].  Following his deposition, Mr. Clauser issued a second supplemental report, which was dated May 6, 2016.  Mot. to Strike Clauser Report and Preclude Testimony Ex. F, [ECF No. 96-8].  All of Mr. Clauser's reports were served in accordance with the Scheduling Order.

In addition, Plaintiffs designated Mark A. Lieberman, M.A., C.R.C., as Mr. Montgomery's vocational rehabilitation expert.  Mr. Lieberman issued two reports, dated July 7, 2014, and October 14, 2015, respectively.  *See* Mot. to Exclude Lieberman Testimony Ex. A & B, [ECF Nos. 98-2, 98-3].  Each report was timely served.  On April 11, 2016, counsel for CSX deposed Mr. Lieberman.  *See* Mot. to Exclude Lieberman Testimony Ex. D, [ECF No. 98-5]. Finally, on March 3, 2016, Defendant Jamco designated Dhyana Ranjan Pattanayak, Ph.D., as a liability expert, and, specifically, as an expert in the field of physical metallurgy.  *See* Mot. to Strike Pattanayak Report and Preclude Testimony Ex. A, [ECF No. 97-2].  Dr. Pattanayak issued his expert report on March 16, 2016, and was deposed on May 18, 2016.  *See* Mot. to Strike Pattanayak Report and Preclude Testimony Ex. B & C, [ECF Nos. 97-3, 97-4].  The pending motions seek to strike the reports and/or preclude the testimony of each of these three experts.

## II.    LEGAL STANDARD

In each of the motions, CSX provides the same two alternative legal bases for its requests to strike and/or preclude expert testimony.  First, CSX argues that each expert's reports and testimony should be stricken and/or precluded because the respective expert opinions were untimely provided to CSX in violation of Federal Rules of Civil Procedure 26(a)(2) and 26(e). In the alternative, CSX argues that each expert's opinion is inadmissible, at least in part, under Federal Rules of Evidence 702 and 703.

**A. Legal Standard for Striking Expert Reports and Precluding Testimony Under Federal Rules of Civil Procedure 26(a)(2), 26(e), and 37(c)**

Federal Rule of Civil Procedure 26(a)(2)(A) requires parties to disclose "the identity of any witness [they] may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Fed. R. Civ. P. 26(a)(2)(A). In addition, Rule 26(a)(2)(B) requires parties to produce written reports for any witness who is "retained or specially employed to provide expert testimony in the case" or "whose duties as the party's employee regularly involve giving expert testimony." Fed. R. Civ. P. 26(a)(2)(B). An expert's report must be detailed and complete, and must include "a complete statement of all opinions the witness will express and the basis and reasons for them [and] the facts or data considered by the witness in forming them." *Id.*; *see also Osunde v. Lewis*, 281 F.R.D. 250, 257 (D. Md. 2012) ("[T]he report must contain 'a complete statement of *all* opinions the witness will express,' as well as the basis and reasons for those opinions and the facts or data considered by the witness in forming his opinions.") (emphasis in original); Fed. R. Civ. P. 26 advisory committee note (1993) (noting that the report "should be written in a manner that reflects the testimony to be given" by the expert witness).

A report is complete, and compliant with Rule 26(a)(2), if it is sufficiently detailed such that "surprise is eliminated, unnecessary depositions are avoided[,] and costs are reduced." *Sullivan v. Glock, Inc.*, 175 F.R.D. 497, 503 (D. Md. 1997) (citations and internal quotation marks omitted). Federal Rule of Civil Procedure 26(e) requires that a Rule 26(a)(2) disclosure be supplemented "in a timely manner if the party [making the disclosure] learns that in some material respect the disclosure or response is incomplete." Fed. R. Civ. P. 26(e)(1)(A). This required supplementation, however, "does not create a right to produce information in a belated fashion." *EEOC v. Freeman*, 961 F. Supp. 2d 783, 797 (D. Md. 2013). "To construe

4

supplementation to apply whenever a party wants to bolster or submit additional expert opinions would [wreak] havoc on docket control and amount to unlimited expert opinion preparation." *Campbell v. United States*, 470 F. App'x 153, 157 (4th Cir. 2012) (citations and internal quotation marks omitted).

A party who fails to properly disclose information under Rule 26(a)(2) is precluded from introducing the information at trial, unless the failure was substantially justified or harmless. Fed. R. Civ. P. 37(c).  In *Southern States Rack and Fixture, Inc. v. Sherwin-Williams Co.*, the Fourth Circuit articulated five factors that lower courts should consider:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

318 F.3d 592, 596-97 (4th Cir. 2003).  The nondisclosing party bears the burden of establishing that its Rule 26(a)(2) violation does not warrant preclusion.  *Id.* at 597.  While the Rule 37(c) sanction of striking expert testimony is self-executing and automatic, *see* Fed. R. Civ. P. 37(c) advisory committee note (1993), courts are conferred "broad discretion" in determining whether a party's noncompliance with Rules 26(a)(2) and (e) was substantially justified or harmless, *Southern States Rack and Fixture, Inc.*, 318 F.3d at 596.

The Fourth Circuit has noted that the "basic purpose" of Rule 37(c) is to prevent surprise and prejudice to the opposing party.  *Id.*  Thus, four of the five factors articulated in *Southern States*—"surprise to the opposing party, ability to cure that surprise, disruption of the trial, and importance of the evidence—relate mainly to the harmlessness exception," since the Court's focus in determining whether preclusion is appropriate should be on the prejudice that the opposing party will suffer if the testimony is admitted.  *Id.* at 597.  "[T]he remaining factor—the

explanation for the nondisclosure—relates primarily to the substantial justification exception." *Id.*

### B. Legal Standard for Precluding Expert Testimony Under Federal Rules of Evidence 702 and 703

Under Federal Rule of Evidence 702, expert testimony is admissible if it will assist the trier of fact, and: (1) is "based on sufficient facts or data;" (2) is "the product of reliable principles and methods;" and (3) the principles and methods have been applied "reliably . . . to the facts of the case." Fed. R. Evid. 702. The expert testimony also must rest on a reliable foundation and must be relevant. *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 597 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) (extending *Daubert* to "the testimony of . . . other experts who are not scientists"). In the instant case, CSX's challenges to the experts' testimony under Rules 702 and 703 relate only to reliability. Several factors may be relevant to the Court's determination of reliability, including: (1) whether the expert's theory or technique has been tested, (2) whether it has been subjected to peer review and publication, (3) the known or potential rate of error, and (4) whether the theory or technique is generally accepted within a relevant scientific community. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001). These factors, however, are "neither definitive nor exhaustive, and some may be more pertinent than others depending on the nature of the issue, the expert's particular expertise and the subject of his testimony." *Newman v. Motorola, Inc.*, 218 F. Supp. 2d 769, 773 (D. Md. 2002). The expert testimony need not be "irrefutable or certainly correct." *United States v. Moreland*, 437 F.3d 424, 431 (4th Cir. 2006). Because "expert testimony is subject to testing by vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof," the court's task is not to decide the correctness of the opinion. *Id.* (citation and internal quotation marks omitted). However, a conclusory finding that is based

upon subjective belief, rather than any valid scientific method or experience, is not reliable, and

is thus inadmissible. *Cooper*, 259 F.3d at 200.

The Court's inquiry into the reliability of an expert's testimony is "flexible," and focuses

on "the principles and methodology employed by the expert." *Daubert*, 509 U.S. at 594-95.   In

determining whether proffered testimony is sufficiently reliable, "the court has broad latitude to

consider whatever factors bearing on validity the court finds to be useful; the particular factors

will depend on the unique circumstances of the expert testimony involved." *Id.*   An expert's

"conclusions regarding causation must have a basis in established fact and cannot be premised on

mere suppositions." *McLean v. 988011 Ontario, Ltd.*, 244 F.3d 797, 801 (6th Cir. 2000).   If an

expert's testimony is based on assumed facts, those facts "must find some support . . . in the

record." *Id.*   The Court must exclude expert testimony if it is so fundamentally unreliable that it

can offer no assistance to the jury." *Goyal v. Thermage, Inc.*, 2011 WL 691185, at *3 n.8 (D.

Md. Feb. 18, 2011) (quoting *Meterlogic, Inc. v. KLT, Inc.*, 368 F.3d 1017, 1019 (8th Cir. 2004)).

## III.   DISCUSSION

### A.   CSX's Motion to Strike Report and Preclude Testimony of Mr. Montgomery's Liability Expert Witness, Craig D. Clauser, P.E.

#### 1.   Whether Mr. Clauser's Report Should be Stricken Pursuant to Federal Rule of Civil Procedure 37(c)

CSX argues that striking Mr. Clauser's report is appropriate under Rule 37(c) because

Mr. Clauser allegedly introduced a novel theory and basis for his opinion, for the first time in his

deposition, and failed to disclose his reliance on that theory in his reports.   Mr. Clauser's June

22, 2015 report ("the First Clauser Report") opined that Mr. Montgomery's accident occurred

because CSX "failed to take proper action to provide a reasonably safe work place for their

employees after learning that the Jamco Products carts were defective and dangerous."   First

Clauser Report at 5, Mot. to Strike Clauser Report and Preclude Testimony Ex. B.  Mr. Clauser stated that CSX should have removed all of the Jamco carts from service after it was brought to its attention that some of the welds on some of the Jamco carts in the Cumberland Yard were defective and required repair.  *Id.* at 4.  Mr. Clauser based this opinion on his review of CSX's discovery responses, and on Mr. Montgomery's deposition testimony that a welder, Mike Kennell, had performed weld repair on some of the Jamco carts that had broken at the Cumberland Yard.  *Id.* at 1-2.

Mr. Clauser's supplemental report ("the Supplemental Clauser Report"), which was prepared on October 19, 2015 following Mr. Clauser's review of Mr. Kennell's deposition testimony, contained the same conclusions.  *See* Supp. Clauser Report at 2, Mot. to Strike Clauser Report and Preclude Testimony Ex. D ("Mr. Kennel [sic] testified that he had repaired Jamco cart welds which had been found to be broken by CXS [sic] employees at different times before the subject incident . . . Thus CSX failed to take proper action to provide a safe work place by removing the defective carts from service after Mr. Kennel [sic] encountered these conditions.").  Mr. Clauser did not use a specific term to describe CSX's inaction in either report.

During his deposition on March 30, 2016, Mr. Clauser testified that, upon learning that some Jamco cart welds had been repaired, CSX should have "[c]ome up with an effective inspection practice from looking at the welds" and should have removed all of the carts in use from service and tested them before putting them back in service.  Clauser Dep. Tr. at 136:17-21, Mot. to Strike Clauser Report and Preclude Testimony Ex. E.  He opined that "there should be a practice and a culture in a safety conscious organization to learn from near misses like this," and, for the first time, termed such safety protocol and practice as "the concept of near miss management."  *Id.* at 136:22-25, 137:6-7.  When asked specifically whether the near miss

management theory is recommended in "peer-reviewed journal articles and professional organization articles" and "taught in engineering schools," Mr. Clauser responded in the affirmative, and stated that near miss management theory is taught as "part of the prevention techniques in failure analysis." *Id.* at 143:24-25, 144:1-2 & 11-12; *see also id.* at 145:24-25, 146:1-4. He testified that the concept of near miss management is "a recognized part of any good safety program." *Id.* at 144:22-23. Mr. Clauser stated that, with respect to "just the concept of near miss management," CSX "do[esn't] seem to have that [in practice]. They don't seem to facilitate getting the reporting back from the worker that there is a problem and getting it to decision-makers and addressing it." *Id.* at 137:6-11, Mot. to Strike Clauser Report and Preclude Testimony   Ex. E. When asked to identify the specific authority he relied on to formulate that opinion, Mr. Clauser answered that he relied on "[s]afety literature that this [safety concept] is an accepted part of accident prevention." *Id.* at 137:17-19. Mr. Clauser noted that he did not "cite [any] specific references" to this safety literature in his reports, because the near miss management theory is "just part of [his] training. What [an employer] [should] do about it is in my reports." *Id.* at 138:4-10.

Mr. Montgomery served Mr. Clauser's second supplemental report ("the Second Supplemental Clauser Report") on May 6, 2016. *See* Mot. to Strike Clauser Report and Preclude Testimony Ex. F. Mr. Clauser offered this report after reviewing the March 16, 2016 report of Dr. Pattanayak, Jamco's liability expert, and the April 1, 2016 report of Dr. Zupan, CSX's liability expert. In specifically rebutting Dr. Zupan's report, Mr. Clauser stated that CSX's alleged knowledge of broken critical welds on Jamco carts "could have and should have been seen as near-misses of accidents and caused preventive (sic) action to be taken." Second Supp. Clauser Report at 2, Mot. to Strike Clauser Report and Preclude Testimony Ex. F. Mr. Clauser

added that "[t]he peer reviewed paper in the May 2013 issue of the <u>Journal of the American Society of Safety Engineers</u> by Mike Williamsen titled *Near-Miss Reporting* gives a good description and history of this safety practice." *Id.* He concluded, "Having reviewed [Dr. Pattanayak's and Dr. Zupan's] reports, I have not changed my opinions and they remain as stated in my prior reports and in my deposition testimony." *Id.*

CSX asserts that Plaintiffs should be precluded from introducing Mr. Clauser's opinions at trial because Mr. Clauser's reports did not satisfy Rule 26(a)(2)'s completeness requirement. Neither of Mr. Clauser's first two reports "mentions, much less discloses, that the 'concept of near miss management' was a 'basis or reason' for Mr. Clauser's opinion" or that "Mr. Clauser intends to opine that CSX[] failed to implement 'the methodology [of] the near miss management theory of safety.'" Mot. to Strike Clauser Report and Preclude Testimony at 16, [ECF No. 96-1]. Thus, "Mr. Clauser's deposition testimony establishes that the [First and Supplemental] Clauser Report[s] are both deficient" under Rule 26(a)(2), since they did not provide CSX with a "complete statement of Mr. Clauser's opinions and the basis and reasons for them," which has "severely prejudiced" CSX and is neither justified nor harmless. *Id.* Further, CSX claims, the fact that Mr. Clauser explicitly mentioned in his second supplemental report that he relied on near miss management theory to develop his opinion cannot cure the Rule 26(a)(2) violation, since this reliance "was not based on information that was not available at the time of" the initial disclosure of Mr. Clauser as an expert witness. *Id.* at 16-17 (emphasis and internal quotation marks omitted) (citing *Freeman*, 961 F. Supp. 2d at 797); *see also Campbell*, 470 F. App'x at 157.

Plaintiffs maintain that CSX's characterization of Mr. Clauser's deposition testimony is inaccurate. According to Plaintiffs, "[a]lthough later reports and his deposition give a label to

the theory, and some information about sources that explain the theory, they did not change [Mr. Clauser's] original opinions." Pls.' Opp. to Mot. to Strike Clauser Report and Preclude Testimony at 13, [ECF No. 104]. Instead, Mr. Clauser "maintained the same opinions" of the basis for CSX's liability from his first report, through his deposition, to present. *Id.* at 11.

Contrary to CSX's contentions, the record reveals that Mr. Clauser's opinion remained unchanged throughout his reports and during his deposition. His use of the term "near miss management" in his deposition does not render his first and supplemental reports incomplete. In his first report, Mr. Clauser opines that "[o]nce [CSX] became aware that the welds on the subject Jamco carts were defective and needed weld repairing, CSX should have removed all of the Jamco carts from service." First Clauser Report at 4, Mot. to Strike Clauser Report and Preclude Testimony Ex. B. As the basis for his opinion, Mr. Clauser cites "the material [he] reviewed, [his] examination and testing, and [his] experience and training." *Id.* at 5. The Supplemental and Second Supplemental Clauser Reports, which were issued once Mr. Clauser had the opportunity to review newly produced materials, reiterate this opinion.

For example, the Supplemental Clauser Report states that "Mr. Kennel [sic] testified that he had repaired Jamco cart welds which had been found to be broken by CXS [sic] employees at different times before the subject incident," and concludes that "[t]he same action that was taken after the incident of removing the carts from service should have been taken earlier when these Jamco carts first began to fail due to having been defectively welded." Supp. Clauser Report at 2, Mot. to Strike Clauser Report and Preclude Testimony Ex. D. Likewise, in his second supplemental report, Mr. Clauser opines, "When [CSX's liability expert] states that when carts had been brought in for weld repair at CSXT they 'did not look like the subject cart post-failure,' I understand him to mean that welds were broken but the cart shelf had not collapsed. This

information (broken critical welds) could have and should have been seen as near-misses of accidents and caused preventive [sic] action to be taken."  Second Supp. Clauser Report at 2, Mot. to Strike Clauser Report and Preclude Testimony Ex. F.

While Mr. Clauser indeed identified the specific industrial safety label for his theory of CSX's liability (the near miss management theory) for the first time during his deposition, this mere labeling of the theory cannot be deemed to be new information such that Rule 37(c) exclusion is warranted.  Using words other than "near miss," Mr. Clauser opines in the two reports issued before his deposition that, on the basis of his training and expertise in engineering and workplace safety, CSX should have inspected all of the Jamco carts in use when employees first brought the prospect of weld failure to Mr. Kennell's attention, and when Mr. Kennell repaired the welds on those carts, before the welds actually failed.  This opinion is synonymous with Mr. Clauser's deposition testimony that the cracked welds were "near misses."  *See* Clauser Dep. Tr. at 136:22-25, Mot. to Strike Clauser Report and Preclude Testimony Ex. E.  The use of the term "near miss management," and the citation to a journal article explaining that theory of management in the Second Supplemental Clauser Report, simply restated Mr. Clauser's conclusions from his previous reports using a specific term.

Because the Court finds that there was no Rule 26(a)(2) violation, neither exclusion nor a lesser sanction is appropriate. Moreover, given this Court's finding that the use of the term "near miss management theory" does not constitute new information, the redeposition of Mr. Clauser is unwarranted.

### 2.  Whether Mr. Clauser's Testimony Should Be Precluded Pursuant to Federal Rules of Evidence 702 and 703

In the alternative, CSX argues that Mr. Clauser's testimony must be excluded under Federal Rules of Evidence 702 and 703 because the basis for his opinion that there were near

misses before Mr. Montgomery's accident is unreliable.  Essentially, CSX alleges that, without further factual support or evidence, the welds of certain Jamco carts having been repaired before Mr. Montgomery's accident cannot suffice to indicate that these welds were in an unsafe condition, such that the need for their repair constituted a "near miss."  To support their assertion, CSX cites an article stating that "[b]y definition, near [] misses leave no injuries, and no property or equipment damage.  They also leave little (or no) evidence that they even occurred . . . Employees should be encouraged to report any condition they believe to be unsafe as a near [] miss."  Mot. to Strike Clauser Report and Preclude Testimony at 20 (quoting Mike Williamsen, *Near-Miss Reporting A Missing Link in Safety Culture*, J. of the Am. Soc'y of Safety Engineers 47 (May 2013)).  Thus, according to CSX, a near miss is "an unsafe condition that caused a close call with respect to a potential injury to an employee or piece equipment [sic]," and  since "[t]he fact that Mr. Kennell repaired an unknown number of tool carts . . . standing alone, does not support the conclusion that the other tool carts constituted 'unsafe conditions.'"  *Id.*  at 20, 21.

CSX's reliance on the article's definition of "near miss" is misplaced.  Put simply, Mr. Clauser's opinion is that if a company knows that some of its cart welds have cracked and require repair, the company should check all of its carts to determine whether any other welds require repair as well.  CSX's assertion that Mr. Clauser must show that the cracked welds were themselves unsafe, or likely to cause damage to the performance or integrity of the carts, misses the point.  Indeed, Mr. Clauser did not contend that the cracked welds themselves were "unsafe," but rather that the existence of the cracks could have led to an unsafe situation, as evidenced by the fact that Mr. Kennell thought they required repair and repaired them.  CSX argues that, "to reach [his] conclusion" that the cart repairs signified a potentially unsafe condition, Mr. Clauser

lacks "some evidence that, before Mr. Kennell made the repairs, the performance, structural integrity, or weight capacity of the other tool carts was diminished . . . or that the tool carts were . . . not able to be used for their intended purpose." *Id.* at 21.   But, in so arguing, CSX improperly inserts an inference that Mr. Clauser did not make in his opinion.   There is nothing in Mr. Clauser's reports or deposition testimony, or in the excerpt of the article discussing near miss safety contained in CSX's motion, to suggest that, for near miss management theory to apply to this case, the "near misses" need to be of exactly the same nature as the ultimate "hit." Mr. Clauser's use of the term "near misses" does not make his opinion unreliable or violative of Rules 702 and 703, and it will not be precluded on that basis.

### B. CSX's Motion to Strike Report and Preclude Testimony of Jamco's Liability Expert Witness, Dhyana Ranjan Pattanayak, Ph.D.

In a separate motion, CSX argues that the report of Jamco's liability expert, Dr. Dhyana Pattanayak, should be stricken because his opinions contained therein do not comply with Federal Rules of Evidence 702 and 703.   *See* [ECF No. 97].   Dr. Pattanayak offers three opinions: (1) that there was preexisting damage to the subject cart prior to the incident; (2) that the preexisting damage should have been noticed and repaired by CSX; and (3) that none of the opinions of Mr. Clauser or CSX's liability expert, Dr. Zupan, are reliable.   *See* Jamco's Opp. to Mot. to Strike Pattanayak Report and Preclude Testimony at 6, [ECF No. 108-1].   In its motion, CSX contends that Dr. Pattanayak's first and second opinions are inadmissible under Rules 702 and 703, because Dr. Pattanayak conceded in his report and during his deposition that he did not perform the testing and analysis required to enable him to render any opinions concerning the cause of the tool cart's failure, and that his opinion was limited to discrediting the method of failure analysis undertaken by both Dr. Zupan and Mr. Clauser.   Mot. to Strike Pattanayak Report and Preclude Testimony at 7.   In its reply to Jamco's opposition to the instant motion,

CSX argues that Dr. Pattanayak's third opinion regarding the reliability of the other liability experts in this case must be precluded as it pertains to Dr. Zupan's testing methods because Jamco failed to timely disclose, under Rules 26(a)(2) and 26(e), that Dr. Pattanayak would opine as to Dr. Zupan's reliability.

On August 12, 2016, Jamco filed a "Reply to Defendant CSX Transportation, Inc.'s Reply." *See* [ECF No. 116]. The Court construes this document as both a surreply, and, since surreplies are discretionary, a motion for leave to file a surreply. As a general rule, this Court does not permit parties to file surreplies. *See* Loc. R. 105.2.a (D. Md. 2016); *see also Nicholson v. Volkswagen Grp. of Am., Inc.*, No. RDB-13-3711, 2015 WL 1565442, at *3 (D. Md. Apr. 7, 2012). The purpose of this proposed surreply, however, is to narrow the contested issues. In its proposed surreply, Jamco withdraws its assertion that CSX did not make the subject cart available for inspection to Dr. Pattanayak. Jamco's Mot. for Leave to File Surreply/Surreply at 2. Jamco also avers that it "will not elicit any testimony from Dr. Pattanayak regarding the cause of the failure of the subject cart" or "whether CSXT (and its employees) acted reasonably and knew or should have known of a problem with the cart prior to the incident." *See id.* at 2. Accordingly, Jamco's surreply disposes of all but one of the opinions to which CSX objected in its motion.

The only remaining aspect of CSX's motion concerns whether Dr. Pattanayak should be permitted to opine at trial as to the reliability of Dr. Zupan's analysis and testing. In Dr. Pattanayak's March 16, 2016 report, he stated that "[i]n order to determine the root cause of [the] failure of the incident cart, a comprehensive metallurgical analysis is required, which includes destructive testing." Pattanayak Report at 2, Jamco's Opp. to Mot. to Strike Pattanayak Report and Preclude Testimony Ex. 3, [ECF No. 108-4]. CSX contends that Jamco's Rule 26(a)(2)

disclosure indicates that Dr. Pattanayak's opinion would address only the reliability of the opinion rendered by Mr. Clauser, and not the opinion of Dr. Zupan.  CSX's Reply to Jamco's Opp. at 7, [ECF No. 109].  Since Jamco did not indicate, in its Rule 26(a)(2) disclosure, that Dr. Pattanayak would opine about the adequacy of CSX's liability expert's testing, and Jamco did not supplement its Rule 26(a)(2) disclosure pursuant to Rule 26(e) after Dr. Zupan's report was issued, Dr. Pattanayak should be precluded from offering testimony at trial as to the sufficiency of Dr. Zupan's testing.  *Id.*

Jamco admits in its surreply that it did not supplement its Rule 26(a)(2) disclosure as required by Rule 26(e), but asserts that its failure to explicitly supplement this disclosure is harmless under the five-factor test articulated in *Southern States*.  Jamco's Mot. for Leave to File Surreply/Surreply at 2-3 [ECF No. 116].  As to the first factor, Jamco maintains that CSX "could not have been surprised" when Dr. Pattanayak testified that his opinion applied to Dr. Zupan as well as Mr. Clauser, because CSX "certainly knew of the exact nature and details" of Dr. Pattanayak's opinion regarding the "elements and protocols" needed for an adequate failure analysis, and knew that its expert, Dr. Zupan, had not followed this protocol.  *Id.* at 3.  Jamco also argues that CSX has been afforded an opportunity to cure any harm, since Dr. Zupan rebutted Dr. Pattanayak's opinion "at great length" during his own deposition, and that, since no trial has been scheduled, no disruption would take place if Dr. Pattanayak was "allowed to simply testify that his original protocol opinion also applies to [Dr.] Zupan."  *Id.*

Moreover, Jamco asserts, Dr. Pattanayak's testimony as to Dr. Zupan's testing method is "integral to the liability determination in the negligence and products liability claims" in this case, such that precluding it would be fatal.  *Id.* at 3.  In Jamco's view, both Mr. Clauser and Dr. Zupan will testify that the cart's collapse was due to bad welds used by Jamco in its manufacture.

*Id.* at 3-4.  Thus, "[i]f [Dr.] Pattanayak's protocol opinion is not allowed to be applied to Zupan as well as to Clauser, Zupin's [sic] opinion will stand unopposed to prove Plaintiffs' negligence claims against Jamco."  *Id.* at 4.  Jamco concedes that there is no explanation for failing to supplement its disclosure other than that its failure was "an oversight not realized until Pattanayak's deposition, which was after the deadline for supplementation."  *Id.* at 4.

Contrary to Jamco's contentions, the *Southern States* factors merit preclusion in this case. Although Dr. Pattanayak's report was issued two weeks before Dr. Zupan's report, such that Dr. Pattanayak's report could not have included an opinion about the adequacy of Dr. Zupan's testing, Dr. Pattanayak testified that he had received Dr. Zupan's report at least two weeks prior to his deposition on May 18, 2016.  *See* Pattanayak Dep. Tr. at 12:7-24, 13:1-3, CSX's Reply to Jamco's Opp. Ex. A, [ECF No. 109-1].  Jamco's counsel knew before Dr. Pattanayak's deposition that Dr. Pattanayak had reviewed Dr. Zupan's report and had expressed opinions about it.  The parties' Rule 26(e) supplemental disclosures were also due before Dr. Pattanayak was deposed, but Jamco failed to serve a belated supplement or to request the Court's permission to do so.  *Id.* at 72:10-24.  Because Jamco did not make clear to CSX before Dr. Pattanayak's deposition that Dr. Pattanayak intended to opine about Dr. Zupan's report as well as Mr. Clauser's, CSX undoubtedly was surprised at Dr. Pattanayak's deposition.

Moreover, CSX has not been given, and does not have, adequate opportunity to rebut Dr. Pattanayak's testimony, since the discovery and expert disclosure deadlines have long passed. The Court cannot determine that permitting Dr. Pattanayak to testify about Dr. Zupan's testing would be harmless, given the prejudice that CSX has suffered as a result of this surprise opinion.[1]  Finally, this Court's finding that preclusion is warranted is narrow, and does not alter

---

[1] Allowing the testimony would essentially require reopening expert discovery to permit CSX to rebut Dr. Pattanayak's opinion, and the Court declines to do so at this late date.

Dr. Pattanayak's ability to testify as to the cause of the cracked welds and the alleged deficiencies in Mr. Clauser's testing methods.   Rather, the Court grants CSX's motion to preclude Dr. Pattanayak's testimony only as to that testimony which relates to "Dr. Zupan, his methodology, and his conclusions."  *See* CSX's Reply to Jamco's Opp. at 10.

### C. CSX's Motion *in Limine* to Exclude, in Part, Testimony of Mr. Montgomery's Vocational Expert Witness, Mark Lieberman, M.A., C.R.C.

Mr. Montgomery's Rule 26(a)(2) disclosure designated Mark Lieberman as a vocational expert who would testify about Mr. Montgomery's job capabilities, liabilities, and future earnings potential.  Mr. Lieberman authored two reports in which he opined that, as a result of his workplace accident, Mr. Montgomery's chances of returning to work in an area outside of teaching positions are "slim."   First Lieberman Report at 13, Mot. to Exclude Lieberman Testimony Ex. A, [ECF No. 98-2].  Mr. Lieberman concluded that Mr. Montgomery's earning potential was reduced from $29.00 per hour to a maximum of $10.00 per hour after his accident, but that Mr. Montgomery would "significantly increase his earning capacity with the obtainment of a Bachelor[']s degree in Education and securing a position as a secondary school teacher," a career that Mr. Montgomery is currently pursuing.  *Id.* at 16.  Neither of Mr. Lieberman's reports mentioned the likelihood of Mr. Montgomery finding a teaching position in western Maryland, or accounted for a potential magnification of lost earnings due to an extended job search period and the concomitant lack of teaching opportunities in western Maryland.

During Mr. Lieberman's deposition on April 11, 2016, however, he predicted, for the first time, that Mr. Montgomery's job prospects in education would be limited due to a lack of teaching opportunities in western Maryland.  Lieberman Dep. Tr. at 52:4-19, Mot. to Exclude Lieberman Testimony Ex. D, [ECF No. 98-5].  When asked the basis for this opinion, Mr. Lieberman stated that he "would" look at Maryland Department of Labor and Licensing's

statistics on the number of people in secondary school positions, as well as "a list of the number of high school[s] and middle schools in the western Maryland area," but noted that he had not undertaken this research, and that his opinion about Mr. Montgomery's prospectively difficult job search was based on "just know[ing] from having done job placement in the western Maryland area." *Id.* at 52:24-25, 53:1-14. Throughout this line of questioning during his deposition, Mr. Lieberman stated that Mr. Montgomery would have more difficulty finding a teaching position in western Maryland as compared to finding a similar position in a metropolitan area like Baltimore or Pittsburgh. *See id.* at 52:7-13, 53:12-18, 54:21-25, 57:1-6.

Mr. Lieberman did not issue a supplemental report by the Rule 26(a)(2) disclosures deadline. Thus, CSX argues, because Plaintiffs' Rule 26(a)(2) disclosure did not state Mr. Lieberman's opinion that it will take Mr. Montgomery "a while" to find a job as a teacher in western Maryland, and because the nondisclosure was neither justified nor harmless, this particular opinion must be excluded from evidence at trial. In the alternative, CSX argues that Mr. Lieberman's opinion concerning the purported difficulty of Mr. Montgomery's ability to obtain a teaching job must be excluded because it fails to comply with Rules 702 and 703. In their response to CSX's motion, Plaintiffs concede that this opinion was not presented in either of Mr. Lieberman's reports, and was stated for the first time during Mr. Lieberman's deposition. Pls.' Opp. to Mot. to Exclude Lieberman Testimony at 7, [ECF No. 106]. However, Plaintiffs argue that the opinion should not be precluded because CSX has not suffered actual harm or prejudice, and because the opinion is based on a proper foundation in accordance with the Federal Rules of Evidence.

Even assuming *arguendo* that the failure to disclose the disputed opinion was harmless, Mr. Lieberman's opinion regarding the length of time it will take for Mr. Montgomery to find a

job as a teacher in western Maryland lacks reliability and a sound evidentiary foundation. Plaintiffs correctly note that the Court's *Daubert* inquiry and gatekeeping role is necessarily flexible. *See Ruffin v. Shaw Industries, Inc.*, 149 F.3d 294, 296 (4th Cir. 1998). Even under this liberal standard, however, Mr. Lieberman's disputed opinion falls far short of the admissibility requirements promulgated in Rules 702 and 703.

During his deposition, Mr. Lieberman testified that while he "d[idn't] recall" ever having tried to place a teacher in western Maryland, and had not reviewed any data or statistics regarding job opportunities there, he felt justified opining that Mr. Montgomery will have a difficult time securing such a position because he knows that there are fewer job opportunities there generally. *Id.* at 53:10-25, 54:1-25, 56:2-25, 57:2-3. He based this opinion on his "clinical judgment" stemming from his "education, training and experience, which includes knowledge of the data sources," and clarified that his "knowledge of the data sources provides to [him] the abilities to say with a reasonable degree of probability [that] it's more likely than not [that] there are fewer opportunities in [Mr. Montgomery's] area than there are in the metropolitan area in general." *Id.* at 54:10-25. When pressed on his "knowledge of the data sources," Mr. Lieberman admitted that this knowledge encompasses his "understanding of the Maryland Department of Labor . . . website," which enables him to "know exactly where to go to find the number of . . . post-secondary education teachers [in] Western Maryland Education," and his access to the Occupational Outlook Handbook. *Id.* at 55:1-19. However, he conceded that the website would not "tell [him] necessarily [] the growth for [teaching] position[s] in [western Maryland]," and that the handbook also would only reveal "nationally what the growth is for [a teaching position]," and not specifically what the job outlook would be for western Maryland.[2] *Id.*

---

[2] Notably, Mr. Lieberman could not state for certain whether the data sources he would consult would contain *any* information to support his assertion regarding the job market for teachers in western Maryland. He explained to

Mr. Lieberman noted that he had not looked specifically at any data, charts, or other conveyors of statistical analysis to form his opinion, and that he relied on his "knowledge of the charts in general." *Id.* at 56:8-10. He clarified that "if the case were to go to trial, [he] would bring those charts with [him] and . . . [would] certainly have no problem producing those charts," but that he did not know what the charts would say, and that his expectation of what the statistics would reveal was based only on his "experience working in the western Maryland region placing people [but not teachers] and knowing that there is fewer numbers[s] of opportunities in general within all occupational groups." *Id.* at 56:10-25, 57:1-3. According to Mr. Lieberman, if he is "asked [at trial] to draw a 25-mile circle around where [Mr. Montgomery] lives, [he will be able to answer] how many high schools and middle schools [there are in that circle]," and he "expect[s] [to have] that information." *Id.* at 63:18-25, 64:1. When asked, however, if this information is "information anyone could go online and obtain," Mr. Lieberman responded that it is. *Id.* at 64:2-4.

In response to questions over how his training as a vocational counselor led to expertise in the job market in western Maryland, or the state of Maryland generally, Mr. Lieberman stated, "[W]orking in the college environment as a college counselor [from 1999 to 2001 and 2003 to 2005, in Baltimore City and Harford County, respectively] . . . when I had students that would come in and talk to me about wanting to become a teacher[,] I had to understand what the likelihood [was] that they would be able to obtain positions . . . in general." *Id.* at 60:4-16. He also stated that, as a vocational rehabilitation counselor, he is "more in-tuned to listening or reading the articles when [he] see[s] what market trends are for different occupations" than "the

---

CSX's counsel that he was "hoping" that the Maryland Department of Labor, Licensing, and Regulation website would "tell [him] the number of people in secondary school positions," but also noted that he was "kind of concerned because typically if [that number] is under a certain number, [the website] just have an asterisk there and might not give the number." Lieberman Dep. Tr. at 53:1-6, Mot. to Exclude Lieberman Testimony Ex. D.

average person" would be, "because when [he] see[s] an article [about where teachers will be needed in the future], [he is] going to go out of [his] way to read that [article] because that's [his] area of interest." *Id.* at 60:17-25, 61:3-6.

Mr. Lieberman's uncertainty regarding the very subject about which he professes to offer an expert opinion belies Plaintiffs' claim that Mr. Lieberman is qualified to testify about the western Maryland teaching market.  It is not clear from his deposition testimony that his disputed opinion is to a reasonable degree of certainty.  Notably, he opined that "it *might* take [Mr. Montgomery] a while [to find a job as a teacher]," and that he "*believe[s]* [finding a teaching job is] going to take him a while because it is a much harder, limited job market in western Maryland[.]"  *Id.* at 76:5-7, 77:1-3 (emphasis added).  But, as noted above, Mr. Lieberman could not state a sound and objective basis for this opinion.  Mr. Lieberman also conceded that western Maryland likely has fewer people applying for high school and middle school teaching jobs than a metropolitan area, but maintained that Mr. Montgomery would still have difficulty finding a job simply because there are fewer numbers of schools there.  *Id.* at 65:15-20.  Yet, in the very next sentence, Mr. Lieberman agreed "in general" that "the number of schools alone does not determine whether or not [Mr. Montgomery] would have the ability to get a job."  *Id.* at 65:23-25, 66:1.  The Fourth Circuit has established that an opinion will not be accepted "simply because 'the expert says it is so.'"  *Shreve*, 166 F. Supp. at 399 (quoting *Alevromagiros v. Hechinger Co.*, 993 F.2d 417, 421 (4th Cir. 1993) (citations and internal quotation marks omitted)).  Mr. Lieberman's opinion "may be an opinion, but it is not a scientific opinion, or an opinion supported by appropriate validation."  *Id.*  Rather, it is merely Mr. Lieberman's subjective opinion, and must therefore be excluded.  *See General Electric v. Joiner*, 522 U.S. 136, 146 (1997).

## IV.  CONCLUSION

For the reasons set forth above, CSX's motion to strike the report and preclude the testimony of Mr. Clauser, (ECF No. 96), is DENIED; CSX's motion to strike the report and preclude the testimony of Dr. Pattanayak, (ECF No. 97), is GRANTED only as to Dr. Pattanayak's testimony regarding the opinions of CSX's liability expert, Dr. Zupan, and DENIED AS MOOT as to all other testimony; and CSX's motion to exclude Mr. Lieberman's testimony regarding the availability of teaching jobs in western Maryland, (ECF No. 98), is GRANTED.

Dated:  September 26, 2016

_____/s/_____
Stephanie A. Gallagher
United States Magistrate Judge